**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ABBY BUCHMILLER and RONALD
HOUSKEEPER, [1]

Plaintiffs,

and

AMANDA ROSEBURG,

Intervenor,

v.

KRANNICH SOLAR WEST, LLC,

Defendant.

Civil Action No. 22-07221 (RK) (TJB)

**OPINION**

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon cross-motions to confirm and vacate the

arbitration award issued in *Krannich Solar West, LLC v. Ronald Housekeeper et al.*, AAA Case

No. 01-22-0000-4550 (the "Arbitration") on September 15, 2023. (*See* ECF No. 35-3 ("Final

Award").) Defendant Krannich Solar West, LLC[2] ("Defendant" or "Krannich") filed a Motion to

Confirm the Arbitration Award. (ECF No. 35.) Plaintiffs Abby Buchmiller ("Buchmiller") and

Ronald Houskeeper ("Houskeeper") (together "Plaintiffs") filed a Cross-Motion to Vacate the

Arbitration Award. (ECF No. 38.) Each party filed oppositions. (ECF Nos. 40 (Defendant), 43

---

[1] Ronald Houskeeper's name was spelled incorrectly as "Housekeeper" in the case caption and other
pleadings. (*See* ECF No. 35-1 at 1 n.2.) For accuracy, the Court uses the correct spelling, Houskeeper.

[2] As of January 1, 2025, Krannich Solar West, LLC merged into Krannich Solar East, LLC, with Krannich
Solar East, LLC as the surviving entity. (*See* ECF No. 55 at 1 n.1.) Pursuant to the Federal Rules, this action
may be "continued . . . against the original party." Fed R. Civ. P. 25(c). "Rule 25(c) does not require that
anything be done after an interest has been transferred." *Moroccanoil, Inc. v. Conforti*, No. 11-136, 2021
WL 2310092, at *3 (D.N.J. June 4, 2021). Accordingly, this Opinion applies to Krannich Solar East, LLC.

(Plaintiffs).) Intervenor Amanda Roseburg ("Roseburg") joined Plaintiffs' briefs, and also filed her own Brief in Support of the Motion to Vacate. (ECF No. 45.) The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion to Confirm the Arbitration Award (ECF No. 35) is **GRANTED** and Plaintiffs' Motion to Vacate the Arbitration Award (ECF No. 38) is **DENIED.** The Arbitration Award is **CONFIRMED.**

## I.    BACKGROUND

This matter arises out of a 2023 arbitration that resolved a dispute over a personal guarantee for an alleged breach of contract. At the center of the dispute is Empire Solar Group ("Empire Solar"), a solar energy company that was owned by Ron Houskeeper, and his daughters Abby Buchmiller and Amanda Roseburg. (Final Award at 5.) In the case at bar, Houskeeper and Buchmiller are co-plaintiffs, and Roseburg is an intervenor. In addition to possessing ownership shares in Empire Solar, Buchmiller and Roseburg founded the company and served as Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively. (*Id.*) Another sister, Ronda Buchmiller ("Ronda") worked as an Empire Solar employee alongside her sisters and father (but had no ownership stake). (*Id.* at 3.)

In 2019, Empire Solar began a business relationship with Krannich Solar West, a solar panel supplier. (*Id.*) After a period of routine orders and payments, Empire Solar ceased payment to Krannich, despite owing hundreds of thousands of dollars. (*Id.* at 10–11.) To recoup the outstanding balance, Krannich sought to enforce a personal guarantee signed by Houskeeper, Buchmiller, and Roseburg. (*Id.* at 11–12.) Houskeeper, Buchmiller, and Roseburg, however, claimed they never signed such a guarantee. (*See* ECF No. 6-1 ("SoD") at 1.)

To resolve the dispute, the parties engaged in protracted arbitration proceedings for nearly two years. (*See* Final Award at 12–26.) In September 2023, following a two-day evidentiary hearing that included testimony from seven witnesses, the Arbitrator issued a 60-page decision that painstakingly evaluated testimony, technical evidence, and legal arguments and ultimately found Plaintiffs and Roseburg jointly and severally liable for the debts owed to Krannich, plus interest and attorney's fees. (*Id.* at 55–59.)

In this court, Krannich subsequently filed a Motion to Confirm the Arbitration Award (ECF No. 35), and Plaintiffs filed a Cross-Motion to Vacate the Arbitration Award (ECF No. 38). Plaintiffs seek to vacate the Arbitrator's Award on grounds that they themselves did not sign, and were not aware of, a personal guarantee on a line of credit extended to their family business. The Motion and Cross-Motion are now pending before the Court and are ready for disposition.

## A. ROSEBURG'S BANKRUPTCY PROCEEDINGS

On July 31, 2024, months after Plaintiffs and Defendant filed their respective motions to vacate and confirm the arbitration award, Intervenor Roseburg filed for bankruptcy in the District of Utah. *See In re Roseburg*, No. 24-br-23800 (Bankr. D. Utah). By function of the Bankruptcy Code, all judicial actions then-proceeding against Roseburg—including, as applicable, this case—were subject to a stay pending the outcome of the bankruptcy matter. *See* 11 U.S.C. § 362(a)(1) (prohibiting "the continuation of . . . judicial action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy] case"). Defendant and Roseburg stipulated to allow the proceeding before this Court to proceed as to Plaintiffs Buchmiller and Houskeeper only, leaving Roseburg's stay intact. (No. 24-br-23800 (ECF No. 55-1.) On January 6, 2025, the Honorable Kevin R. Anderson, U.S.B.J. signed an Order granting Defendant relief from the automatic stay as "to confirmation of the Arbitration Award against

Non-Debtor Guarantors Abigail Buchmiller and Ronald Houskeeper." (*Id.*) Accordingly, as part of Defendant's letter to this Court on January 7, 2025, Defendant requested that the Court "sever and stay [the case] as to Roseburg." (ECF No. 55.)

At a teleconference on February 11, 2025, no party objected to severing and staying this matter as to Roseburg. (*See* ECF No. 63.) The Court, therefore, can properly proceed with deciding whether to confirm the arbitration award only as to co-plaintiffs Buchmiller and Houskeeper (who are jointly and severally liable with Roseburg), in order to both comply with the statutory requirements of the Bankruptcy stay and bring finality to the arbitration. *See Ingenieria, Maquinaria Y Equipos De Colomba S.A. v. ATTS, Inc.*, No. 17-3624, 2017 WL 6316632, at * 5 (D.N.J. Dec. 8, 2017) ("A successful party who has won an arbitration against two parties, jointly and severally, is free to pursue either one or both parties. By seeking to enforce the arbitrator's award only against the non-bankrupt party, [plaintiff] is clearly within its rights, rending moot the issue whether it could have also proceeded against the bankrupt [party].")

Accordingly, the Court grants Defendant's request and severs and stays this matter as to Roseburg only. Buchmiller and Houskeeper are not affected by the stay put in place through the bankruptcy proceeding; this Opinion and accompanying Order apply to Buchmiller and Houskeeper in full.

### B. FACTUAL BACKGROUND

The Court begins by describing the underlying facts that led the parties to arbitration, and then summarizes the Arbitrator's decision and the subsequent proceedings before this Court. Krannich who initiated the arbitration,[3] is part of a large international group that, as of 2019,

---

[3] The Court highlights here, for clarity, that Krannich initiated the arbitration and was the "petitioner" in that action. However, due to the procedural posture of this case in federal court, Krannich is referred to in the case caption and throughout this Opinion as the "Defendant." Similarly, Buchmiller and Houskeeper, who were the "respondents" in the arbitration action, are "Plaintiffs" here.

claimed to be the largest wholesaler of solar panels internationally. (Final Award at 5.) Krannich is incorporated in Delaware and maintains a primary business address in Oceanside, California. (*Id.* at 1.) Plaintiffs and Roseburg each live in Utah. (*Id.*) Plaintiff Houskeeper owned 25% of Empire Solar, and two of his children, Plaintiff Buchmiller and Intervenor Roseburg, each also owned 25%. (*Id.* at 5.) The final 25% of the business was owned by Houskeeper's brother, Jake Houskeeper. (*Id.*) At its peak in 2020, Empire Solar had "approximately 600 employees and provided services in 18 different states with 22 branches." (*Id.* at 5.)

The relationship between Defendant and Empire Solar began in June 2019 when Christopher Serna ("Serna"), a former Executive Sales Representative for Defendant, spoke to Buchmiller about how Defendant could help Empire Solar procure panels, modules, and other products from certain solar manufacturers. (*Id.*) Later that year, Serna communicated directly with Roseburg and Tyler Jacobsen, an Empire Solar Procurement Manager, about purchasing solar panels from Defendant. (*See* ECF No. 6-4.) Jacobsen and Serna exchanged emails, communicated occasionally with Roseburg and Buchmiller about the details, and ultimately agreed to purchase certain panels on a "net-30 account," whereby Empire Solar would have 30 days after receiving an invoice to pay for the products purchased. (*Id.* at 3–5.) When asked whether there was a financing fee for the "net-30" program, Serna responded that there was a 2% fee, and also attached a blank credit application that Empire Solar would need to complete if it "want[ed] to take that route." (*Id.* at 4; Final Award at 9.) Roseburg was also copied on this email chain. (ECF No. 6-4 at 3.) Serna and Jacobsen continued to negotiate specific terms and pricing of the transaction. (Final Award at 5–6; ECF No. 6-4 at 2–4.) At one point, Empire Solar asked for a line of credit of up to $500,000, but ultimately $100,000 was agreed upon. (*See* Final Award at 9.)

On November 18, 2019 Jacobsen emailed Serna a completed and electronically signed Credit Application. (*Id.* at 6; ECF No. 6-4 at 2; ECF No. 35-4.) No other Empire Solar employee was copied on Jacobsen's email to Serna with the completed Credit Application. (*See* ECF No. 6-4 at 2.) The Credit Application—the agreement at issue here—consists of a multi-paged written document titled "Company Registration with Personal Guarantee," with a box checked at the top requesting "Credit Terms" rather than "Prepayment terms." (ECF No. 35-4 at 1.) The Terms and Conditions Acknowledgement ("Acknowledgment") were affixed with electronic signatures of Buchmiller and Roseburg, and are reproduced below:

**Terms and Conditions Acknowledgment\***

By signing this Application, I accept Krannich Solar West LLC Terms and Conditions. As part of such investigation, I authorize Krannich Solar West LLC to request and obtain consumer credit reports on me in connection with the opening, monitoring, renewal and extension of this and other accounts with Krannich Solar West LLC and the marketing of other products and services to me and my business. I further authorize Krannich Solar West LLC to share the information received from my consumer credit report with Krannich Solar West LLC parent, subsidiaries, and affiliates [and others if applicable]. Upon requested, Krannich Solar West LLC will notify me whether my consumer credit report was requested and, if so, the name and address of the consumer credit reporting agency whom furnished the report.

I, as an officer of the company, accept and agree to pay within the established Terms of Sale.

**\*Please attach a copy of your resale certificate to this application for our records.**

| *First Name AMANDA | Middle Initial | *Last Name ROSEBURG | *Social Security Number ▮▮▮4009 |
|---|---|---|---|
| *Present Home Address 436 JOSHUA DRIVE | | | *Home Phone Number 801-513-4267 |
| *City KAYSVILLE | | *State UT | *Zip 84037 |
| *Authorized Signature | | | *Date 11/18/2019 |

**[If you wish to inquire upon multiple owners, you must have authorized access for each individual]**

| First Name ABBY | Middle Initial | Last Name BUCHMILLER | Social Security Number ▮▮▮0245 |
|---|---|---|---|
| Present Home Address 1698 W 600 N | | | Home Phone Number 801-391-2588 |
| City FARMINGTON | | State UT | Zip 84025 |
| Authorized Signature | | | Date 11/18/2019 |

(*Id.* at 3.)

Also reproduced below, on the same page as the Terms and Conditions Acknowledgment, is the Personal Guarantee which bears the electronic signatures of Roseburg, Buchmiller, and Houskeeper:

**Personal Guarantee\***

In consideration of the extension of credit by Krannich Solar West LLC to the customer (identifies at the beginning of the Credit Application), the undersigned hereby unconditionally guarantees the immediate payment when due of all monies owed at any time by the said Customer to Krannich Solar West LLC. The obligation of the Undersigned shall not be terminated or changed in any aspect not withstanding any circumstances or occurrence whatsoever which otherwise might terminate or change the obligation of the Customer. The Undersigned hereby consents and agrees to all of the terms and provisions of the below "Terms or Sale" as fully set forth herein. Without limitation of the foregoing, the Undersigned also unconditionally guarantees the payment by the aforesaid Customer to Krannich Solar West LLC of any and all finance charges, attorney's fees and collection costs. The Undersigned shall be personally obligated and liable hereon regardless of the inclusion hereunder of a corporate name or office. The term "Undersigned" shall mean each person whose signature appears below regardless of number or gender.

I, as an officer of the company, accept responsibility for any debt incurred, and agree to pay within the established Terms of Sale.

| Signature | Signature | Signature |
|---|---|---|
| Printed Name | Printed Name | Printed Name |
| AMANDA ROSEBURG | ABBY BUCHMILLER | RON HOUSKEEPER |
| Social Security Number | Social Security Number | Social Security Number |
| ████4009 | ████0245 | ████8880 |
| Address | Address | Address |
| 436 JOSHUA DR | 1698 W 600 N | 375 PADDOCK LN |
| City/State/Zip | City/State/Zip | City/State/Zip |
| KAYSVILLE, UT 84037 | FARMINGTON, UT 84025 | KAYSVILLE, UT 84037 |

(*Id.*) Both the Acknowledgment and the Personal Guarantee refer to the "Terms and Conditions of Sale," which comprise ten sections of fine print across the two subsequent pages of the document. As relevant here, section 9 of the "Terms and Conditions of Sale" contains an arbitration clause. (*Id.* at 5.) The Arbitration Clause mandates that "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach hereof, shall be submitted to and be finally resolved by binding arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1." (*Id.*) The provision provides that the award may be enforced "in the United States District Court for the District of New Jersey." (*Id.*) Further, the provision conveys that "although the terms of the Agreement of sale are to be governed by New Jersey law, this arbitration agreement, and whether it is enforceable, is to be governed and determined by the federal law of the United States of America, particularly the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and related jurisprudence." (*Id.*)

7

After a few years of regular orders and mostly-on-time payments, Empire Solar began to fall behind on its obligations to Krannich. (Final Award at 10.) According to Krannich, beginning in April 2021, Empire Solar began to increase the number of orders and to delay payment. (*Id.*) Between May 27, 2021 and July 9, 2021, Empire Solar submitted 128 different purchase orders to Krannich, followed by corresponding invoices for payment. (*Id.*) By June 4, 2021, Empire Solar had an outstanding balance of $700,000 with an additional approximately $200,000 remaining to be invoiced. (*Id.*) On August 23, 2021, Empire Solar filed for Chapter 7 bankruptcy, at which point it still owed Krannich over $700,000 in unpaid invoices. (*Id.* at 12; *In re Empire Solar Grp., LLC*, No. 21-br-23636 (Bankr. D. Utah).)

### C. PROCEDURAL HISTORY

#### a. *Arbitration Begins*

On September 7, 2021, Krannich sent Plaintiffs and Roseburg a demand letter, seeking payment of $743,217.45, and cited Plaintiffs and Roseburg to their signed personal guarantee, which, by its terms, was a requirement "in consideration of the extension of credit by Krannich." (ECF No. 6 at 14–15; ECF No. 35-4 at 3.) On January 31, 2022, Krannich filed its Demand for Arbitration with the American Arbitration Association ("AAA"). (ECF No. 35-5.) Roseburg filed an Answer in the Arbitration on February 18, 2022. (*See* Final Award at 12.) Plaintiffs filed a joint Statement of Defense on April 6, 2022. (*See* SoD.)

In their responses to Krannich's Demand for Arbitration, Plaintiffs and Roseburg claimed that they never personally guaranteed any debt. (SoD at 1.) The Statement of Defense asserted that Krannich was attempting to "trump up false debts against [Plaintiffs and Roseburg]" to take over Empire Solar and "sideline" Plaintiffs and Roseburg from the solar panel installation industry. (*Id.*)

Plaintiffs further purported to reserve all rights to "challenge the validity of this forum and the arbitration clause." (*Id.*)[4]

Throughout discovery and the eventual arbitration hearing, the parties focused on how Plaintiffs' and Roseburg's signatures ended up on the personal guarantee form, since they claimed they never signed it. (*See generally* Final Award at 26–27.) As exhibited above, the completed Credit Application—sent by Jacobsen to Serna in 2019—was electronically signed. (*Id.* at 8.) Plaintiffs averred they were not aware of a personal guarantee to secure the credit from Krannich. (SoD at 1.)

Discovery and a preliminary one-day hearing revealed that the Credit Application at issue was signed online using an electronic signature service called DocuHub. (Final Award at 8.) On November 29, 2022, during discovery in the arbitration proceeding, DocuHub provided an "audit trail" of the Credit Application, which revealed that Buchmiller, Roseburg, and Houskeeper's signatures had been electronically affixed to the document via the DocuHub account of Ronda Buchmiller. (*Id.*) The parties dispute Ronda's exact role at Empire Solar—Plaintiffs maintain she was a data entry clerk, while Defendant says she had a larger role in the accounting and accounts payable functions. (*Id.*)

The revelation that it was Ronda's DocuHub account that affixed the signatures to the Credit Application spurred Roseburg to request the arbitration's dismissal the next day. (*Id.* at 18.) Roseburg argued that because Plaintiffs and Roseburg had not, in fact, signed the Credit Application, they also had not consented to arbitrate, thus stripping the arbitrator of his jurisdiction.

---

[4] Roseburg, in an Answer to the Arbitration Demand, did not specifically contest the Arbitrator's jurisdiction. (*See* ECF No. 40-2 at 5.) In a separate brief in support of vacating the Arbitrator's award, Roseburg argues that she joined Plaintiffs Buchmiller and Houskeeper "in all of their objections to AAA's alleged jurisdiction." (ECF. No. 45 at 2.) Since Roseburg is severed from this Opinion, the Court does not decide whether Roseburg preserved or waived any jurisdictional objections.

(*Id.*; ECF No. 6-6.) On December 8, 2022, after considering extensive email communications from the parties, the Arbitrator declined to immediately dismiss the arbitration, relying on Rule 7(a) of the AAA Commercial Arbitration Rules "which state that the arbitrator has the power to rule on his or her jurisdiction, including on objections to the 'existence' of the arbitration agreement." (ECF No. 6-7 at 1.) The Arbitrator pledged to "issue a determination on jurisdiction shortly after receiving [Defendant's] input." (*Id.*)

### b.  *Declaratory Judgment and Order to Show Cause*

Notwithstanding, Plaintiffs did not wait for the Arbitrator's determination. Instead, on December 11, 2022, Plaintiffs filed a Complaint in this court, seeking a declaratory judgment that the Arbitrator did not have jurisdiction over the case. (*See* Final Award at 19; ECF No. 1 ("Compl.").) Plaintiffs requested that the court stay the Arbitration pending resolution of the jurisdictional question, determine that the AAA never had jurisdiction, void the Arbitrator's determinations rendered thus far, and award reasonable attorney's fees and costs. (Compl. at 7–8.) Plaintiffs also filed a Motion requesting an Order to Show Cause and Temporary Restraining Order to immediately stay the Arbitration on the basis that if the Arbitration moved forward, Plaintiffs would suffer irreparable harm. (*See generally* ECF No. 4.)

On December 15, 2022, the Honorable Michael A. Shipp, U.S.D.J., during a telephonic hearing, denied Plaintiffs' Motions, finding that Plaintiffs had failed to allege the requisite irreparable harm which is required in order to obtain a temporary restraining order. (*See* ECF No. 21 at 10:15–17.) Judge Shipp also noted that, by the date of the hearing, the Arbitrator "had already written a pretty lengthy opinion finding that he does have jurisdiction over the dispute." (*Id.* at 10:2–5.) Judge Shipp found the Arbitrator's determination "to be persuasive," and also recognized that, at this point, Plaintiffs were only "about a month away from the commencement of the

evidentiary hearing." (*Id.* at 10:5–11.) Finally, Judge Shipp held that "any questions . . . with request to the existence, scope, or validity of the arbitration agreement are not appropriate for resolution on TRO application." (*Id.* at 10:18–10:21.)

### c. *Arbitrator's Decision*

Following Judge Shipp's denial of Plaintiffs' Motion, the parties continued through the arbitration process and participated in a final two-day evidentiary hearing on June 28 and 29, 2023. (Final Award at 25.) On September 15, 2023, the Arbitrator issued its 60-page decision that found Plaintiffs and Roseburg to be jointly and severally liable for breach of contract. (*Id.* at 55.) The Court recounts here only the Arbitrator's findings that are relevant to this Opinion:

A question of primary focus was whether Plaintiffs and Roseburg consented or directed Ronda to electronically sign their names to the credit application. At the hearing, Ronda testified that she would have known that signing a personal guarantee required communication and consent from Plaintiffs and Roseburg, and that she would never have signed the document on their behalf without obtaining same. (*Id.* at 27.) Despite some apparent waffling, Plaintiff Buchmiller agreed that employees at Empire Solar, including Ronda, knew not to apply other peoples' signatures to documents without obtaining their authority. (*Id.* at 29.) The Arbitrator found that the testimony "present[ed] a coherent narrative that Ronda Buchmiller was herself aware that she should not put anyone else's signature on a document unless that person knew about it" and further "that she was also well aware that a personal guarantee was out of the ordinary course of business, such that she needed to present it to the person being asked to sign it." (*Id.* at 28.) The Arbitrator also found that testimony showed that Jacobsen, who forwarded the Credit Application, would not have done so on his own accord without authorization. (*Id.*)

The Arbitrator concluded that, it was "obvious from the number of documents in Ronda Buchmiller's DocuHub account that she regularly applied the signatures of all of the Respondents to various documents." (*Id.*)[5] Accordingly, the Arbitrator concluded that Plaintiffs and Roseburg had authorized Ronda to affix their electronic signatures for the personal guarantee, and found them to be jointly and severally liable for the outstanding balance of Empire Solar's contracts with Krannich. (*Id.* at 35.)

In finding for Defendant, the Arbitrator also considered at length, the odd absence of any internal communications about the Credit Application. (*Id.* at 38.) After failing to locate any emails between Plaintiffs and Roseburg regarding the Credit Application, Defendant learned that Plaintiffs and Roseburg also relied heavily on Slack, an internal instant messaging tool, to communicate about business matters. (*Id.* at 39.) After the Arbitrator issued a summons for the Slack data, (*see id.* at 40), Defendant's expert, Professor Simon, closely reviewed the Slack data and found an anomaly: "[f]or large blocks of time, no messages appear for certain users despite multiple log-ins the same day . . . The only reasonable explanation is that Empire Solar employees **deleted messages from Slack.**" (*Id.* at 43–44 (cleaned up) (emphasis added).) Ultimately, following an exhaustive analysis, the Arbitrator drew "a spoliation inference in this case that destroyed evidence, namely Slack messages engaged among [] Buchmiller and Roseburg and [] Jacobsen and Ronda [] . . . might or would have been unfavorable to the position of [Plaintiffs] in this case." (*Id.* at 49.)

Following the spoliation inference and the Arbitrator's determination that there was strong indicia of an agreement between the parties, the Arbitrator concluded that based on all the evidence

---

[5] Although Houskeeper denied giving his daughter Ronda authorization to sign the Credit Application on his behalf, Defendant's counsel reviewed a Paycheck Protection Program ("PPP") loan forgiveness program application where Ronda had indeed signed Houskeeper's name using DocuHub. (*Id.* at 31–32.)

presented in the case, Ronda had actual authority to place Plaintiffs' signatures on the Personal Guarantee. (*Id.* at 50.) This finding was supported by Jacobsen's testimony that "he coordinated his actions regarding the negotiation of his Credit application with either [] Roseburg or [] Buchmiller" and that "Roseburg instructed him to send the completed and signed Credit Application to" Krannich. (*Id.* at 35.) The Arbitrator also found that Buchmiller and Roseburg accepted the benefits of the credit Krannich extended to Empire Solar, and were aware of the increasing debt. (*Id.* at 51–52.) The Arbitrator found this was sufficient to satisfy the Statute of Frauds under New Jersey law, and, accordingly, the Personal Guarantee provision was legally binding. (*Id.*)

The Arbitrator found Plaintiffs and Roseburg jointly and severally liable for:

- $735,078.30 in unpaid invoices;
- $214,600.22 in interest on the amount of unpaid invoices;
- $574,973.94 in attorney's fees and expenses incurred by Defendant's counsel in enforcing the Personal Guarantee;
- $12,325.00 of the AAA's fees in relation to the Arbitration; and
- $28,967.22 of compensation for the Arbitrator to be reimbursed to the Defendant.

(*Id.* at 59.) In total, the Arbitrator awarded Defendant $1,565,944.68. (*Id.*) The Arbitrator also held that Plaintiffs and Roseburg were jointly and severally liable to Defendant for post-judgment interest on the total amount of the award at an amount specified by New Jersey Court Rule 4:42-11 commencing from the date of the Final Award. (*Id.*)

### d. *Cross-Motions to Confirm and Vacate*

On September 24, 2023, Defendant filed a Motion to Confirm the Arbitration Award pursuant to 9 U.S.C. § 9. (ECF No. 35 ("Def. Mot.").) Plaintiffs filed a Motion to Vacate the Arbitration Award pursuant to 9 U.S.C. § 10. (ECF No. 38 ("Pl. Mot.").) Defendant filed an opposition to Plaintiffs Motion (ECF No. 40 ("Def. Opp.")), Plaintiffs filed a reply (ECF No. 43

("Pl. Rep.")), and Intervenor Roseburg filed her own reply (ECF No. 45). On June 27, 2024, the Court administratively terminated the pending motions and referred this action to mediation by consent of the parties before the Honorable Dennis M. Cavanaugh (ret.). (ECF No. 51.) On January 7, 2025, Defendant conveyed that the mediation had been unsuccessful. (ECF No. 54.) The cross-motions to confirm and vacate the arbitration award are now properly before the Court for its review.

## II.    LEGAL STANDARD

There is a "strong presumption under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, in favor of enforcing arbitration awards." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005), as amended (Mar. 17, 2005) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). "A court may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract . . . or because it believes its interpretation of the contract is better than that of the arbitrator." *United Transp. Union Loc. 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995) (quotation omitted). An award is presumed valid unless it is affirmatively shown to be otherwise, and the validity of an award is subject to attack only on those grounds listed in 9 U.S.C. § 10 or if enforcement of the award is contrary to public policy. *Brentwood Med. Assocs.*, 396 F.3d at 241.

The Federal Arbitration Act ("FAA") articulates only four grounds upon which a district court may vacate an arbitration award:

> **(1)** where the award was procured by corruption, fraud, or undue means;
>
> **(2)** where there was evident partiality or corruption in the arbitrators, or either of them;
>
> **(3)** where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to

hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

**(4)** where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)–(4).

"[R]eview under § 10 focuses on misconduct rather than mistake." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350–51 (2011). In order to vacate an arbitration award, the opposing party "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). "It is not enough for petitioners to show that the panel committed an error—or even a serious error." *Id.* "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice that his decision may be unenforceable." *Id.* (alterations in original) (quotations omitted).

## III.    DISCUSSION

This case boils down to a deceptively simple question: whether Plaintiffs are bound by the contract at issue. Neither party disputes the existence of a document that includes, *inter alia*, both a mandatory arbitration provision and a personal guarantee. The parties do not contest that Plaintiffs' names appear as electronic signatures on the document at issue; they plainly do. Plaintiffs contend, however, that their signatures were affixed to the purported contract without their own knowledge, consent, or involvement, and therefore, they are not bound by it.

The posture of this case requires the Court to address this question twice: *first*, to decide, on its own accord, whether Plaintiffs and Defendant entered into an agreement that delegated to the Arbitrator the power to determine both arbitrability and the underlying merits of the case. *See China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 281 (3d

Cir. 2003) ("the district court independently must determine whether the parties agreed to arbitrate the merits of the dispute."). *Second*, to determine whether the Arbitrator's finding of a binding contract was the result of sufficient misconduct so as to require the Court to vacate the arbitration award. *See AT&T Mobility, LLC*, 563 U.S. at 350.

In answering both questions, the Court finds that a contract indeed existed between Plaintiffs and Defendant. Therefore, the parties agreed both to arbitrate and to personally guarantee the credit application. The Court will not disturb the Arbitrator's decision.

## A. SUBJECT MATTER JURISDICTION

The Court must first determine whether it has subject matter jurisdiction over this case. *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010). The FAA alone does not confer jurisdiction; the court must have an "independent jurisdictional basis" to confirm or vacate arbitration awards. *Badgerow v. Walters*, 596 U.S. 1, 4 (2022). Here, the Court is satisfied that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000. Plaintiffs are residents of Utah, (Compl. ¶¶ 10–12), and Defendant is a resident of both Delaware and California, (*id.* ¶ 9). The full arbitration award at issue is $1,565,944.68, which exceeds the $75,000 threshold. (*See* Final Award at 59.) The requirements of diversity jurisdiction are therefore met. *See Terra Nova Trading v. Cashew Indus. W. Afr.*, No. 24-543, 2024 WL 1897494, at *2 (D.N.J. Apr. 30, 2024) (finding subject matter jurisdiction based on diversity when arbitration award exceeded $75,000).

## B. ARBITRABILITY OF THE DISPUTE

The parties disagree as to whether this dispute should have gone to arbitration in the first place. Plaintiffs argue that, since they purportedly never authorized their signatures on the contract, they never agreed to arbitrate, and the arbitrator therefore lacked jurisdiction over both the merits

of the case and the threshold decision of arbitrability. (Pl. Mot. at 1, 3.) They argue that this Court—rather than arbitration—"is the appropriate venue to render a determination on contract formation and jurisdiction." (*Id.* at 1–2.) In response, Defendant argues that Plaintiffs waived any objection to the Arbitrator's jurisdiction by first participating in the selection of the arbitrator and then taking part in the arbitration itself. (Def. Opp. at 18 ("By submitting the threshold issue to the Arbitrator and agreeing to be bound by the AAA Rules, Plaintiffs' belated attempt to dispute the jurisdiction of the Arbitrator cannot be sustained.").) The Court first addresses whether Plaintiffs waived their objection, and then, as appropriate, addresses the Arbitrator's jurisdiction.

### a.  Waiver

"A party does not have to try to enjoin or stay an arbitration proceeding in order to preserve its objection to jurisdiction." *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1510 (3d Cir. 1994), *aff'd*, 514 U.S. 938 (1995). A party must object to the arbitrability of a claim on a timely basis, or it is waived. *See Teamsters Loc. Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 42–43 (3d Cir. 1985) (finding failure to raise a jurisdictional objection in the first instance is a waiver of that objection); *see also ConnTech Dev. Co. v. Univ. of Connecticut Educ. Properties, Inc.*, 102 F.3d 677, 685 (2d Cir. 1996) ("An objection to the arbitrability of a claim must be made on a timely basis, or it is waived.").

Here, Plaintiffs did not waive their rights to object to the Arbitrator's jurisdiction. At the outset, Plaintiff's Statement of Defense—the first substantive pleading submitted to the Arbitrator—states that

> [Plaintiffs] must reserve all rights, after further discovery and investigation, to amend its pleading to add appropriate counterclaims, and third-party claims, as well as, in the alternatively [sic], to challenge the validity of this forum and the arbitration clause, as part and parcel of a forged document.

(SoD at 3.) "[W]here a party objects to arbitrability but nevertheless voluntarily participates in the arbitration proceedings, waiver of the challenge to arbitral jurisdiction will not be inferred." *Lucey v. FedEx Ground Package Sys., Inc.*, 305 F. App'x 875, 878 (3d Cir. 2009) (quoting *First Options*, 19 F.3d at 1510).

"A jurisdictional objection, once stated, remains preserved for judicial review absent a clear and unequivocal waiver." *First Options*, 19 F.3d at 1510. Although Defendant argues that Plaintiffs agreed to the arbitrator's decision on arbitrability through assenting to the AAA rules and their ongoing participation in the arbitration, the Court finds that this participation does not evidence that they "clearly and unmistakably . . . agreed that the arbitrator should decide arbitrability;" instead, when afforded the ability to do so, they exercised their right to seek judicial review of the arbitrability of the dispute. *China Minmetals*, 334 F.3d at 281.

### b. The Arbitrator's Determination of Arbitrability

The crux of Plaintiffs' argument is that there was no valid contract formed in the first place, and so there was never a consent to arbitration in this case. Plaintiffs argue the Arbitrator exceeded the scope of his authority in finding otherwise, and disregarded the basic principles of New Jersey contract law by holding that he retained jurisdiction. (Pl. Mot. at 5–6, 7–10.) Defendant disputes this characterization, and argues that the Arbitrator was within the scope of his authority to determine his jurisdiction over the dispute and to subsequently adjudicate the final award. (Def. Opp. at 17–19.)

The Third Circuit, summarizing the Supreme Court's opinion in *First Options*, advised that when a party, as here, is seeking to vacate an arbitration award by arguing "that they had not signed the document containing the arbitration clause," "the district court independently must determine whether the parties agreed to arbitrate the merits of the dispute." *China Minmetals*, 334 F.3d at

18

281 (citing *First Options*, 514 U.S. at 943–45); *see also HSM Const. Servs., Inc. v. MDC Sys., Inc.*, 239 F. App'x 748, 751 (3d Cir. 2007) ("Because the issue as to whether [Plaintiff] was a party to the arbitration agreement is an issue of arbitrability, the court must make an independent determination."). "The question of 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter," *i.e.*, whether "the parties agree to submit the arbitrability question itself to arbitration." *First Options*, 514 U.S. at 943. "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability) courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944; *see also James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017) (applying New Jersey law of contract formation in determining whether parties agreed to arbitration). Here, the parties agree that New Jersey law is the correct state law to apply. (*See, e.g.*, Def. Mot. at 13 n.3; Def. Opp. at 20; Pl. Mot. at 8; Pl. Rep. at 2.)

Importantly, the parties do not dispute that the contract at issue contained "Terms and Conditions of Sale" which included an arbitration clause. (*See* ECF No. 35-4 § 9.) Similarly, the parties do not dispute that the language of the arbitration clause, by incorporation of the AAA Rules, allows the Arbitrator to rule on his own jurisdiction and the arbitrability of the claim. (*See id.*; ECF No. 40-5 at 3 (AAA Rule 4-7, "Jurisdiction")); *see also Romanov v. Microsoft Corp.*, No. 21-03564, 2021 WL 3486938, at * 6 (D.N.J. Aug. 9, 2021) ("[B]y incorporating the AAA rules, which need not be appended to the arbitration clause, the parties have clearly and unmistakably committed to delegating the question of arbitrability to the arbitrator."). The only question, then, is whether Plaintiffs are bound by this contract.

Plaintiffs and Defendant entered into an agreement to do business with one another, evidenced by the fact that, over the course of years, Defendant provided goods to Plaintiffs'

business, and Plaintiffs paid for those goods (until, for reasons unrelated to the contract itself, they stopped making certain payments). Under New Jersey law, "'an agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law.'" *James*, 852 F.3d at 265 (quoting *Atalese v. United States Legal Servs. Grp., L.P.*, 99 A.3d 306, 312–13 (N.J. 2014)). To manifest this assent, an offeree "must provide 'unqualified acceptance,' which can be express or implied by conduct." *Id.* (citing *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992)). "Courts have held that when an offeree accepts the offeror's services without expressing any objection to the offer's essential terms, the offeree has manifested assent to those terms." *Weichert Co. Realtors*, 608 A.2d at 285. "Accordingly, where an offeree gives no indication that he or she objects to any of the offer's essential terms, and passively accepts the benefits of an offeror's performance, the offeree has impliedly manifested his or her unconditional assent to the terms of the offer." *Id.*

Here, it is quite clear that Plaintiffs' very conduct is evidence that they assented to the terms of the written contract. The entire business arrangement was subject to comprehensive and detailed "Terms and Conditions of Sale." (ECF No. 35-4 at 4–5.) The written contract that bears Plaintiffs electronic signatures outlines, *inter alia*, the terms of sale of products (*id.* § 1), the mechanisms for delivery and burden shifting for loss risk (*id.* § 2), and the methods of inspection and acceptance (*id.* § 3). Moreover, the Terms provide procedures for pricing, late payment, and interest (*id.* § 4), warranties (*id.* § 5), and liability limitation (*id.* § 6). For years, Empire Solar operated pursuant to these Terms without questioning the existence of a contract. Now, conveniently and self-servingly, after enjoying the benefit of the bargain, Plaintiffs seek to void the contract because, after the fact, one of the provisions is no longer attractive to them. Indeed, the only time that Plaintiffs ever

questioned the existence of the contract was when Defendant attempted to invoke the Personal Guarantee provision. (*See* SoD at 3.)

In particular, Empire Solar, owned by Plaintiffs, took advantage of the credit arrangement precisely as articulated in the written agreement. The contract provided the option to either purchase product on "credit terms" or "prepayment terms," and the signed contract checked the "credit terms" box. (ECF No. 35-4 at 1.) In reliance on those credit terms, Empire Solar received a generous line of credit, starting with a $100,000 line of credit, increasing to a $200,000 line of credit, and ultimately receiving the benefits of a $300,000 line of credit in 2021. (Final Award at 9–10). Additionally, Empire Solar placed well over 100 purchase orders with Krannich over the course of their relationship, including 128 different purchase orders between May 27, 2021 and July 9, 2021. (*Id.* at 10.) These orders, shipments, deliveries, and product acceptances were conducted in accordance with the Terms and Conditions of Sale. (*See* ECF No. 35-4 at 4–5.) By the terms of the agreement, the only mechanism for the contract to go into effect—and for Krannich to start shipping product—was for an "officer of the company" to sign the document. (*See* ECF No. 35-4 at 3.) Plaintiffs do not contend that they were unaware that Empire Solar, their company, was paying substantial sums of money to Defendant, with whom they had placed well more than 100 orders. Furthermore, Empire Solar continuously engaged in the contractual relationship by requesting—and receiving—increases to the agreed-upon credit limit. (Final Award at 9–10.) Empire Solar started with an initial credit limit of $100,000 in 2019, raised it to $200,000 at the end of 2020, and further raised it to $300,000 in May 2021. (*Id.* at 10.) In fact, when Empire Solar sought to be acquired by Suntuity Solar, Plaintiffs acknowledged their business relationship with Krannich, including the sizeable outstanding balance. (*Id.*)

Plaintiffs' electronic signatures also appear on the contract, which, typically, is a manifestation of their unequivocal assent to that contract. *Curtis v. Cellco P'ship*, 992 A.2d 795, 798 (N.J. Super. Ct. App. Div. 2010) ("Plaintiff's acceptance of these terms was confirmed by his electronic signature, as well as his" use of defendant's services).

Plaintiffs' argument is unavailing because, at a minimum, Ronda had apparent authority to sign on behalf of each of the Plaintiffs. Although Plaintiffs contend that they did not formally agree to enter into an agency relationship with Ronda, "there need not be an agreement between parties specifying an agency relationship; rather, 'the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation.'" *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993) (quoting *Henningsen v. Bloomfield Motors*, 161 A.2d 69, 78 (N.J. 1960)).

Plaintiffs' repeated assertions that Ronda was a mere data-entry clerk with whom there was no agency relationship are belied by the reality that she was an employee with very close ties to the executives, here, her father and sisters, and knew about the importance of personal guarantees and routinely acted as a person with authority to sign. Critically, Plaintiffs' conduct, exhibited by their testimony and evidence of prior dealings, demonstrates that Plaintiffs delegated authority to Ronda to sign documents on their behalf. Ronda's involvement in the family business was not limited to Empire Solar—she also worked for Houskeeper's other business, R&J Technical Services. (Final Award at 30-32.) In both businesses, Ronda worked closely with Plaintiffs to manage business affairs, including contracts. (*See id.* at 32.)

Furthermore, Ronda knew that she had been given authority to sign documents on behalf of her sisters and father. Ronda testified that she signed documents at Plaintiffs' request, and only did so when given permission. (*See* Final Award at 27.) Roseburg testified that Ronda specifically

understood the importance of obtaining approval from signatories to sign a personal guarantee. (*Id.* at 50.) As for Plaintiff Houskeeper, evidence shows that Ronda had a history of signing documents for him by electronically affixing his signature to a contract, using the same DocuHub method. (*See id.* at 30–31.) In February 2022, Ronda used DocuHub to place Houskeeper's signature on a PPP loan forgiveness application for a different business, R&J Technical Services. (*Id.* at 32.) Evidently, Houskeeper had conferred authority for her to sign that document, in the same way Ronda had authority to sign on his behalf at Empire Solar. *See Sears Mortg Co.*, 634 A.2d at 79 (inferring authority from "the general course of conducting the business").

The relationship between Plaintiffs, Roseburg, and Ronda is not the only determinant of Ronda's authority to sign the contract. "Of particular importance is whether a *third party* has relied on the agent's apparent authority to act for a principal." *Id.* at 80 (emphasis added) (citing *N. Rothenberg & Son v. Nako*, 139 A.2d 783, 789 (N.J. Super. Ct. App. Div. 1958)). Without question, Defendant had no knowledge that someone other than Plaintiffs and Roseburg (or someone with apparent authority to do so on their behalves) signed the contract. It stands to reason that without duly authorized signatures, Defendant would never have repeatedly shipped products to Empire Solar or extended any line of credit over a number of years, or otherwise operated under the agreed-upon business arrangement set forth in the six-paged written contract. Additionally, the DocuHub "audit trail," which shows the dates and times that Ronda logged into the DocuHub program, accessed the electronic version of the document, and modified the document by affixing signatures, demonstrates that the contract itself was accessed on November 18, 2019. (Final Award at 9.) Only after receiving the signed contract, in December 2019, did Krannich began shipping products to Empire Solar. (*Id.*) As the third party, Defendant reasonably relied on the authenticity of signatures on the contract, or as stated, that whoever signed on Plaintiffs' behalf had the requisite authority

to do so. Certainly, Plaintiffs and Roseburg's conduct and extensive business engagement with Defendant over the years they did business together gives every indication that Defendants reasonably understood there to be a binding contract between the parties.

Plaintiffs argue that even if Defendant did believe that Plaintiffs themselves had signed the contract, "Defendant had an obligation to confirm the veracity of the signatures, as is ordinary practice . . . or, at a minimum, [] demand [] an audit trail demonstrating those persons reflected on the credit application signature line are the persons that executed the credit application." (Pl. Mot. at 9.) This assertion, in a word, appears ridiculous and without support. Defendant had no such duty to undertake such an inquiry or audit, and Plaintiffs have not cited any authority to suggest that they did. "Nothing in New Jersey case law or the Restatement suggests . . . that a third party has an affirmative duty to inquire of one appearing to be a general agent regarding the scope of his authority. Rather, what is required is that the third party act reasonably in light of the facts of which it has notice." *PXRE Corp. v. Terra Nova Ins. Co. Ltd.*, 76 F. App'x 485, 490 (3d Cir. 2003) (interpreting New Jersey agency law). Defendant had no reason to question the signatures on the contract, especially because Plaintiffs' personal information including name, address, phone number, and social security number, appeared on the document. (*See* ECF No. 35-4 at 3.) Defendant also reasonably acted based on information they received from Jacobsen, an employee at Empire Solar, who had been negotiating the payment terms, credit terms, and number of orders. (*See* ECF No. 6-4.) When Jacobsen sent the completed credit application which bore Plaintiffs' signatures, Defendant reasonably understood that the signed document attached to his email was as authorized as the rest of the business negotiation. And, as explained above, Empire Solar's continued reliance on the contract terms including the credit provision, put Defendant on notice that Plaintiffs agreed to the contract in full. There is no indicia that the signatures might not be real

24

or authorized, and thus Defendant acted "reasonably in light of the facts of which it ha[d] notice." *PXRE Corp.*, 76 F. App'x at 490.

Accordingly, the Court determines that both Plaintiffs and Defendant assented to the written contract, which contained a valid arbitration clause that delegated the question of arbitrability to the Arbitrator. Having made this determination, the Court can proceed to decide whether to confirm or vacate the arbitration award itself.

### C. CONFIRMATION OF THE FINAL AWARD

"When an arbitrator has jurisdiction over a dispute, the merits of his award will be reviewed very narrowly." *Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. 249 v. W. Pa. Motor Carriers Ass'n*, 574 F.2d 783, 786 (3d Cir. 1978). The Court need only conduct a "summary proceeding[]," which "furthers the FAA's national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 19 F.4th 236, 244 (3d Cir. 2021) (internal citations omitted). "An arbitrator's decision need be neither wise nor internally consistent." *Citgo Asphalt Refin. Co. v. Paper Allied-Indus. Chem. & Energy Workers Int'l Union Loc. No. 2-991*, 385 F.3d 809, 816 (3d Cir. 2004).

Here, Plaintiffs fail to provide an adequate basis to disrupt the Arbitrator's comprehensive findings. The Arbitrator's Final Award bespeaks a careful and painstaking review of witness testimony, technical evidence relating to DocuHub audit trails and deleted Slack messages, and substantive engagement with each parties' legal arguments. Moreover, the conduct of the parties, each sophisticated business parties, over a number of years, which included well over 100 individual purchases in exchange for at least one million dollars, again clearly indicates the reliance on the written contract.

Section 10 of the FAA allows a district court to vacate an award in only four cases: (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing or in refusing to hear pertinent evidence, or any other misbehavior producing any party; or (4) where the arbitrators "exceeded their powers" or "so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10. The sole bases to vacate the arbitration award found in Plaintiffs' submissions relate only to questioning the arbitrability of the dispute, and whether Plaintiffs' waived their jurisdictional objections—both questions which the Court has ruled upon hereinabove. Plaintiffs make no argument or even raise the specter that the Arbitrator exhibited misconduct via any of the four bases enumerated in Section 10.

Instead, Plaintiffs appear to invoke an "additional common law ground" to vacate an arbitration award: manifest disregard of the law.[6] (*See* Pl. Mot. at 5.) Although Plaintiffs make no specific argument as to how the Arbitrator manifestly disregarded any law, the Court cites the "Standard of Review" section of their brief where Plaintiffs assert that "[w]hen the arbitrators' decision flies in the face of clearly established precedent, the decision should be vacated." (Pl. Mot. at 6 (citing *Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 121 (3d Cir. 2016)).) Construed broadly, the Court interprets Plaintiffs' argument to be that the Arbitrator's decision "fl[ew] in the

---

[6] The grounds to confirm, vacate, or modify an award under 9 U.S.C. § 10 are exclusive—no other grounds are contemplated by the FAA. *See Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008). The Third Circuit, however, has assumed without deciding that "an arbitrator's manifest disregard of the law remains a valid basis for vacating arbitration awards." *Bayside Construction LLC v. Smith*, No. 21-2716. 2022 WL 2593303, at *2 n.6 (3d Cir. July 8, 2022). District courts have harmonized these positions by stating that manifest disregard is "merely shorthand for § 10(a)(3) or § 10(a)(4)," rather than a completely separate basis. *See Vitarroz Corp. v. G. Willi Food Int'l Ltd.*, 637 F. Supp. 2d 238, 245 (D.N.J. 2009) (quotation omitted).

face of clearly established precedent" by deciding the issue of arbitrability and asserting jurisdiction over the case, even though that is "a question of law for the court." (Pl. Mot. at 7.)

"A party seeking to vacate an arbitration award based on the theory that the arbitrators manifestly disregarded the law bears the burden of proving that the arbitrators were fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it." *Bellantuono v. ICAP Secs. USA, LLC*, 557 F. App'x 168, 174 (3d Cir. 2014) (quotation omitted). Here, therefore, Plaintiffs have the burden of proving that the Arbitrator "(1) knew of the relevant legal principle, (2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it." *Paul Green Sch. Of Rock Music Franchising, LLC v. Smith*, 389 F. App'x 172, 177 (3d Cir. 2010).

Plaintiffs have not met their burden. The Court can properly decide the issue of arbitrability at the award confirmation stage without requiring a vacatur based on manifest disregard of the law. *See Langlais v. PennMont Ben. Servs., Inc.*, No. 11-5275, 2012 WL 2849414, at *4 (E.D. Pa. July 11, 2012) (declining to vacate an award on the basis of manifest disregard of the law while still addressing the issues of jurisdiction and arbitrability). Here, upon objections to the Arbitrator's jurisdiction, the Arbitrator submitted a determination to the parties as to the basis of his jurisdiction, and also did not object to the parties submitting his determination to the federal court. (Final Award at 4.) The Arbitrator, of course, conveyed a willingness to abide by Judge Shipp's decision as to enjoining the proceedings on jurisdictional grounds. (*Id.*) Judge Shipp subsequently declined to halt the proceedings, finding the Arbitrator's jurisdictional conclusions "persuasive." (ECF No. 21 at 10:5–11.) Then, the Arbitrator resumed the proceedings on his assumption of jurisdiction. (Final Award at 4.) The Arbitrator carefully considered its jurisdiction and was

deferential to the legal process; hardly the "flouting of governing law" required by the Third Circuit. *See Paul Green Sch. Of Rock Music Franchising, LLC*, 389 F. App'x at 177.

Although it is beyond the Court's purview to interrogate each of the Arbitrator's findings and conclusions, *see Stolt-Nielsen S.A.*, 559 U.S. at 671, the Court here nonetheless highlights the comprehensiveness of the Arbitrator's process and written award. The Arbitration proceedings spanned more than eighteen months and included numerous affirmations, certifications, document exchanges and productions, third-party summonses, challenges to jurisdiction, expert reports, evidentiary hearings, and both pre- and post-hearing briefing from the parties. (*See* Final Award at 26–27.) The Arbitrator addressed jurisdictional, evidentiary, procedural, and legal questions posed from all parties, and meticulously catalogued each interaction and decision across fourteen pages of the Arbitration Award. (*See id.* at 12–26.) The Arbitrator held two evidentiary hearings. The first, a one-day hearing in October 2022, elicited testimony from Ronda Buchmiller and Tyler Jacobsen, and revealed key facts about DocuHub communications with Christopher Serna at Krannich. (*See id.* at 16.) The Arbitrator allowed the parties to conduct follow-up discovery on this testimony, which involved issuing summonses for DocuHub data and additional fact and expert witnesses. (*Id.*)

The Arbitrator also engaged exhaustively with the discovery that Empire Solar used Slack routinely, issuing summonses for data, hearing testimony from an expert witness, carefully reviewing account data, and ultimately incorporating the data and testimony into his Final Award to draw a spoliation inference. (*See id.* at 41–49.) In particular, the Arbitrator noted repeated inconsistencies between Plaintiff Buchmiller's testimony about Slack and the rest of the evidence: while Buchmiller contended that she rarely used Slack for business matters and would never have discussed the contract at issue over Slack, data showed that, internal to Empire Solar, "hundreds

of messages [were] exchanged on Slack on November 18, 2019 alone" including business communications. (*Id.* at 47–48.)

The second evidentiary hearing, a two-day hearing in June 2023, included testimony from seven witnesses including Plaintiffs and Roseburg, each of whom submitted declarations as direct testimony, and then were subjected to cross-examination, re-direct, and rebuttal. (*Id.* at 25.) The Arbitrator's decision bespeaks a careful scrutiny of each of the witnesses, from which he drew conclusions regarding the veracity and credibility of each witness by comparing testimony and recognizing inconsistencies. (*See, e.g.*, *id.* at 27–33.) On the central question of Ronda's authority to affix Plaintiffs' and Roseburg's signature to the personal guarantee, the Arbitrator compared specific quotes from Ronda's testimony and Plaintiffs' and Roseburg's testimony. (*Id.* at 27–31.) He concluded:

> The fundamental contradiction of [Plaintiffs'] case . . .—that Ronda Buchmiller was not authorized to put their signatures on the Personal Guarantee section even though she testified that she would not sign someone's name to something unless that person knew, coupled with [Plaintiffs'] own testimony that Ronda was not authorized to sign their name without their authority—should be enough to find that it is more probable than not that the [Plaintiffs] authorized Ronda Buchmiller to apply their signatures to the Personal Guarantee.

(*Id.* at 35.) The Arbitrator's determination was buoyed by testimony from Jacobsen, a former Empire Solar employee, who claimed to have remembered "many" conversations with Plaintiff Buchmiller and Roseburg about the line of credit and the personal guarantee, since establishing the first line of credit "was a big deal." (*Id.* at 37.) Plaintiffs argued to the Arbitrator that Jacobsen's testimony was fabricated or inconsistent and therefore not reliable. (*Id.*) The Arbitrator analyzed this argument and found Jacobsen to be credible, especially given the consistency between his testimony and Ronda's. (*Id.*)

29

Finally, the Arbitrator engaged extensively with each of the parties' legal arguments. (*See id.* at 49–55.) New Jersey law, the arbitrator explained, requires a promise to be liable for the obligation of another person to be in writing signed by the person assuming the liability, **or by that person's agent**. (*Id.* at 49 (citing N.J. Stat. Ann. 25:1-15 (emphasis added)).) The Arbitrator determined that Ronda had actual authority to affix the signatures to the contract because, as the agent, she "reasonably believe[d] that her two sisters . . . and her father . . . wanted her to put their signatures on the Personal Guarantee section of the Credit Application." (*Id.* at 50.) Furthermore, the Arbitrator determined that Ronda had apparent authority because Defendants, the third party, "reasonably infer[ed] that Ronda Buchmiller was authorized to put the signatures of the [Plaintiffs] on the Personal Guarantee." (*Id.* at 51.) The Arbitrator then reviewed five other defenses asserted by Plaintiffs, including (1) that there was no meeting of the minds, (2) that the personal guarantee was inappropriately hidden in the overall Credit Application, (3) that Defendants did not sufficiently confirm the signatures of the Plaintiffs, (4) that Plaintiffs' liability should be restricted to their credit limit and not the entire outstanding balance, and (5) that Empire Solar did, in fact, pay $250,000 towards the outstanding balance, but it was misapplied. (*Id.* at 52–55.) Quoting from the post-hearing briefs and relevant law, the Arbitrator handily dismissed each defense. (*Id.*)

Overall, there is no question that the Arbitrator clearly "provided the parties an opportunity to have a fair hearing and was prepared to hear relevant evidence." *CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 19 F.4th 236, 246 (3d Cir. 2021). Plaintiffs have provided no evidence to the contrary. The Court finds no basis for vacating the arbitration award.

Accordingly, Defendant's Motion to Confirm the Arbitration Award (ECF No. 35) is **GRANTED** and Plaintiffs' Motion to Vacate the Arbitration Award (ECF No. 38) is **DENIED**.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's Motion to Confirm the Award (ECF No. 35) as to Plaintiffs and directs the Defendant to submit its final accounting of its total damages to the Court, including post-judgment interest, within thirty (30) days. The Court **DENIES** Plaintiffs' Cross-Motion to Vacate the Award (ECF No. 38).

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: February 19, 2025

31